**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ANDRE HUNT | ) | CASE NO.: 1:17-cv-01444 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | WILLIAM H. BAUGHMAN, JR. |
| v. | ) | |
| | ) | |
| FRANK SUNDQUIST, et. al. | ) | **DEFENDANT SUNDQUIST'S** |
| | ) | **TRIAL BRIEF** |
| Defendant's. | ) | |
| | ) | |

**Trial Brief**

I.     **Statement of Facts.**

Plaintiff, Andre Hunt, was a pre-trial detainee at the Ashtabula County Jail. Defendants Frank Sundquist and Mark Ashcraft were Corrections Officers (herein "CO") working for the Ashtabula County Sheriff's Office.

Plaintiff's Complaint states that Sundquist "cuffed my hands behind my back. Once my hands were cuffed, Corrections Officer threw me to the cell floor and immediately held my face down in the water trying to drown me in it." Plaintiff's claim is patently false and contradicted by all the evidence and his own testimony.

Plaintiff's Complaint also states "I had to get on an elevator to be transported to isolation. While in the elevator, up under the inside security camera, Correctional Officer Sundquist continued the punching me in the head and face while Correctional Officer Mark Ashcraft did nothing to stop Correctional Officer Sundquist from beating me." Plaintiff's claim is patently false and contradicted by all the evidence and his own testimony. Plaintiff swore an oath in his

Complaint, "I declare under penalty of perjury that the foregoing is true and correct." Plaintiff has violated that oath.

The facts demonstrate that on July 6, 2015, Plaintiff was assigned to a disciplinary lock-up cell on 3 West of the County Jail as a result of Plaintiff previously assaulting another inmate. On that date, Plaintiff intentionally flooded his cell with water by blocking the toilet and sink with towels and running the water. Plaintiff also placed towels on the floor of the cell blocking the opening at the bottom of the cell door.

COs Sundquist and Ashcraft responded to the cell. Prior to arrival, CO Ashcraft drew his Taser. While pointing the Taser in Plaintiff's direction, Ashcraft ordered Plaintiff to lay on the ground. Plaintiff initially resisted Ashcraft's order and stated "Fuck you." Ashcraft again ordered Plaintiff to lay on the ground and Plaintiff complied voluntarily. CO Sundquist then opened the cell door, allowing the water to run out of the cell. Sundquist then entered the cell and dragged Plaintiff back by his ankles because he couldn't see Plaintiff's hand. Sundquist then attempted to handcuff Plaintiff with his hands behind his back. Plaintiff was in a push-up position and refused to put his hands behind his back. Sundquist then kneeled on Plaintiff's back and attempted to force his body to the ground. Sundquist eventually was able to handcuff Plaintiff with his hands behind his back. Sundquist then lifted Plaintiff from the ground by grasping his arms and the collar of his neck. During this period, in all likelihood, Plaintiff's face was pushed into the remaining water on the ground.

Plaintiff was then transported to an interview room in a different part of the facility. Plaintiff was handcuffed behind the back during transport. CO Ashcraft accompanied the two during the transport but at no time did CO Ashcraft touch or control Plaintiff. Sundquist pushed Plaintiff through a partially opened door to exit the cell block. Sundquist and Plaintiff then had to wait to

exit 3 West while another CO operated an electronic door mechanism. Plaintiff was then escorted to the elevated. While waiting for the elevator, Sundquist maintained control of Plaintiff by pressing his body against the elevator door. When the elevator doors opened, Sundquist pushed Plaintiff into the corner of the elevator. Ashcraft then asked Plaintiff why he flooded his cell. Plaintiff attempted to respond by turning his head in the direction of Ashcraft. Sundquist redirected Plaintiff back into the corner of the elevator. At no time did Sundquist punch, beat, or strike Plaintiff while on the elevator.

Plaintiff was then taken off the elevator and moved to the interview room. Sundquist directed Plaintiff to sit on the bench in the interview room; however, Plaintiff initially refused to sit. Sundquist then forced Plaintiff to sit by placing his hands on his neck/shoulder area. While Plaintiff was seated, CO Ashcraft began to shackle Plaintiff's feet to the bench. Sundquist kept one or both hands on Plaintiff's neck/shoulder area and warned Plaintiff not to kick his partner. Plaintiff was then secured on the interview room and COs Sundquist and Ashcraft left the room. Neither CO had any further contact with Plaintiff that day.

On July 6, 2015, Plaintiff never complained of any pain or injury, never stated he needed medical attention, and never complained of inappropriate handling. Plaintiff admitted that his only complaint was a bruise on his leg. No injuries were observed. Two and one-half (2 ½) years after the incident, Plaintiff admitted that he had no physical or mental pain or injury from the incident.

Plaintiff is presently confined to the Southern Ohio Correctional Institution.

The issue to be decided by the jury in this matter is whether Defendant Sundquist's actions were objectively unreasonable, when viewed in light of the circumstances at the time, in securing

and transporting Plaintiff from his cell to a restraint room at the Ashtabula County Jail on July 6, 2015.

## II.    Controlling Law.

Use of force on a pretrial detainee is judged under a deprivation of due process claim.  To prevail:

> Under 42 U.S.C. §1983, a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable to prevail on an excessive force claim. (citation omitted). (a) This determination must be made from the perspective of a reasonable officer on the scene, including what the officer knew at the time, see *Graham v. Connor*, 490 U.S. 386 , 396 , 109 S. Ct. 1865 , 104 L. Ed. 2d 443 , and must account for the "legitimate interests [stemming from the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security," *Bell v. Wolfish*, 441 U.S. 520, 540, 547, 99 S. Ct. 1861 (1979). *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 192 L. Ed.2d 416 (2015).

The standard must account for the fact the officers "are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 397.  The objectively reasonable standard "turns on the facts and circumstances of each particular case." *Kingsley,* 135 S. Ct at 2473.  Pursuant to Rule 50 of the Federal Rules of Civil Procedure, no jury could conclude that CO Sundquist's action crossed the line into a Constitutional violation.

## III.    Limitations of Damages.

Pursuant to 42 U.S.C. 1997e(e), "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of title 18)."

The 6th Circuit has gone on to note:

4

"There is, of course, a de minimis level of [force] with which the Constitution is not concerned." *Wolfish*, 441 U.S. at 539 n.21 (quoting *Ingraham v. Wright*, 430 U.S. 651, 674, 97 S. Ct. 1401, 51 L. Ed. 2d 711 (1977)). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (internal citation and quotation marks omitted); see also *Wilkins v. Gaddy*, 559 U.S. 34 , 38 , 130 S. Ct. 1175, 175 L. Ed. 2d 995 (2010) (quoting *Hudson v. McMillian*, 503 U.S. 1 , 9 , 112 S. Ct. 995 , 117 L. Ed. 2d 156 (1992)) (noting under the Eighth Amendment that "[a]n inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim"); *Hudson*, 503 U.S. at 9 (noting under the Eighth Amendment that not "every malevolent touch by a prison guard gives rise to a federal cause of action"). Thus, the constitutional floor against excessive force is not consonant with common-law assault. See *Wolfish*, 441 U.S. at 539 n.21; *Wilkins*, 559 U.S. at 38. That is, even where a suspect does not actively resist, the use of force must cross the constitutional line. See, e.g., *Leary v. Livingston County*, 528 F.3d 438, (6th Cir. 2008) at 443 (holding an officer's strike of a non-resisting pretrial detainee — "'[i]n the back of the neck with the side of his hand, performing a karate chop kind of a deal'—was de minimis," and thus did not violate the Constitution). *Hanson v. Madison Cty. Det. Ctr.*, 736 Fed. Appx. 521, 530 (6th Cir. 2018) (attached hereto as provided by Rule).

On July 6, 2015, Plaintiff never complained of any pain or injury, never stated he needed medical attention, and never complained of inappropriate handling. No injuries were observed. Plaintiff's only complaint was a bruise on his leg. When responding to Defendant Ashcraft's Requests for Admissions nearly two and one-half (2 ½) years after the incident, Plaintiff admitted that he had no physical or mental pain or injury from the incident. By statute, Plaintiff cannot claim mental or emotional injury and any claim must be dismissed.

As a result of the above, Plaintiff cannot establish a claim for compensatory damages.


DATED: October 27, 2019                    Respectfully Submitted,


                                           /s/ Daniel J. Leffler
                                           Daniel J. Leffler (0076540)
                                           Ohio Patrolmen's Benevolent Association
                                           10147 Royalton Road, Suite J
                                           North Royalton, Ohio 44133
                                           Ph:     440-237-7900

5

Fax:    440-237-6446
dleffler@opba.com
Counsel for Defendant Sundquist

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above Objections to Plaintiff's Exhibit List was sent to the following parties via the Court's electronic filing system using CM/ECF and by separate email this 28th day of October, 2019:

Tera Coleman
tcoleman@bakerlaw.com

David Proano
Dproano@bakerlaw.com

Taylor Thompson
tathompson@bakerlaw.com

Tim Reid
Treid@mggmlpa.com

Kenneth Smith
ksmith@mggmlpa.com

Veronica Garofoli
vgarofoli@mggmlpa.com

George Gerken
gerkenlaw@gmail.com

/s/ Daniel J. Leffler
Daniel J. Leffler (0076540)

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

JOHN HANSON, Plaintiff-Appellant, MADISON COUNTY DETENTION CENTER, et al., Defendants-Appellees.

Case No. 17-5209

May 22, 2018, Filed

NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28 LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28 BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY.

For JOHN HANSON, Plaintiff - Appellant: Jack Scott Gatlin, Gatlin Voelker KY, Ft. Mitchell, KY; Thomas Patrick Doyle, Attorney, Doyle & Hassman, Newport, KY; Ameer Mabjish, The Risk Firm, Covington, KY.

For MADISON COUNTY DETENTION CENTER, MADISON COUNTY, KENTUCKY, DOUG THOMAS, TIMOTHY CRAIG WHITAKER, BRIAN STAGGS, JOSHUA NAPIER, UNKNOWN DEPUTY JAILER, JASON RAWLINS, DENA BELL, Individually and in their official capacities, Defendants - Appellees: Daniel Barry Stilz, Robert C. Stilz, III, Lynn Sowards Zellen, Kinkead & Stilz, Lexington, KY.

BEFORE: MOORE, COOK, and McKEAGUE, Circuit Judges.

DAVID W. McKEAGUE

**[\*523] DAVID W. McKEAGUE, Circuit Judge.** On a fateful February night in 2013, John Hanson got into a bar fight and found himself at the Madison County Jail in Richmond, Kentucky. Hanson was no angel when he arrived—having just been arrested for disorderly conduct, he appeared physically agitated, verbally combative, and extremely drunk. Yet he departed worse for the wear—though detained for just one night, he suffered contusions, torn muscles, cervical strains, and nerve damage. Hanson sued for excessive force, but the district court dismissed all his claims.

On appeal, the trouble is piecing together what happened during Hanson's stay at the jail. The sworn testimony is incompatible; someone is not telling the truth. The district court used limited video evidence to conclude Hanson's *exact* version of events was "wholly contradicted by the record." In so doing, the district court improperly made credibility determinations, weighed the evidence, and discredited Hanson's *entire* version of events. This case requires a jury's evaluation into whether Hanson endured excessive force. Thus, we **AFFIRM IN PART** and **REVERSE IN PART** the district court's judgment and **REMAND** this case for trial.

© 2019 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

## I. BACKGROUND

On Friday, February 24, 2013, John Hanson, a resident of Dayton, Ohio, traveled to Richmond, Kentucky, for a friend's birthday festivities. On Saturday, Hanson and a group of friends spent their day at the river in Madison County grilling and "hanging out." Later that night, Hanson and company went to one friend's house to enjoy "a few drinks," and another friend's house to enjoy more. At the latter house, Hanson estimated that he drank four beers in approximately thirty minutes while the group waited for a taxi. The group then rode in the taxi to JerZees, a bar in downtown Richmond, arriving around 11:30 p.m. At JerZees, Hanson "had a couple shots" and "a couple beers" before the bar closed at 1:00 a.m. As the bar was **[**2]** closing, Hanson and a companion ordered additional shots. All agree that by that time, Hanson was intoxicated.

When he attempted to close out his tab, Hanson claims someone pushed him twice without any reason, and he tripped, falling to the floor. When he came to his feet, several JerZees employees "surrounded" and "basically attacked" Hanson. A video from the bar shows Hanson being carried out by several men. After being thrown out, Hanson admits he attempted to punch one of the bar's bouncers, which can be seen on video. As a result, Richmond Police Officers Jake Adkins and Catherine Eaves, who were stationed outside JerZees and witnessed the altercation, got involved. Officer Adkins, having witnessed Hanson's attempt to batter the bouncer, tackled and handcuffed Hanson. For his part, Hanson says he recalls essentially nothing between the time of his arrest until after deputies placed him in a restraint chair, which we'll examine later.

Officer Adkins transported Hanson to the Madison County Detention Center (MCDC). Hanson entered the MCDC booking area verbally sparring with Officer Adkins. The other jailers began the booking process, including requesting Hanson's personal information and belongings. **[*524]** Hanson, who had started placing his personal belongings on the booking counter, shifted gears and asked, "Before this, what am I getting arrested for?" After law enforcement informed Hanson he was arrested for "disorderly conduct," and asked him to "take it easy," Hanson pointed at Officer Adkins and began arguing and cursing about wanting to press assault charges against someone else at the bar. Officer Adkins attempted to explain to Hanson that he could not file charges for a misdemeanor he did not witness, and that Hanson would need to go to the county attorney's office after being released if he wished to press charges. When Officer Adkins asked if Hanson was from Kentucky, Hanson replied, "No, I'm not from Kentucky, I'm from an educated fucking state."

After hearing Officer Adkins explain that Hanson could not file charges then and there, Hanson asked, "Do you want me to call 911?" At this point, Officer Adkins and other jail deputies grew impatient with Hanson and began to talk more sternly to him. Officer Adkins told Hanson to "call whoever you want to call" and walked away as other deputies instructed Hanson to proceed with the booking process. Hanson nonetheless continued to ask, "Do you want me to call the police?" which prompted one of the deputies to curtly retort, "Because obviously they're not here talking to you trying to explain you your situation."

Hanson, growing more agitated, responded that they were "talking and you're sitting there fucking jabbering," and banged items from his pockets onto the counter.

After some additional back and forth, a deputy told Hanson to "drop the fucking attitude, alright?" Hanson, who was in the process of placing something on the counter, turned toward Deputy Brian Staggs. Deputy Staggs testified that he perceived Hanson's statement and movement as a "combative stance" that threatened him. Deputy **[**3]** Staggs then took his hand and placed it on Hanson's upper-chest and neck area and shoved him against the wall.

In response, Hanson pushed Deputy Staggs backward. Deputies Josh Napier and Timothy Whitaker jumped in to assist Deputy Staggs and attempted to restrain Hanson. After a brief struggle, they followed him through a door from the booking area into the breath-alcohol testing room, where Officer Alfred Gray was located with another suspect. Officer Gray grabbed Hanson, who in his view, was attempting to "fight[] off the jailers." The video does show Hanson initially resisting attempts to be restrained. However, shortly thereafter, it appears that officers had subdued Hanson. Officer Gray maintained control of Hanson's arms, which remained suspended in the air, and Deputy Staggs took

© 2019 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

control of Hanson's right arm.

At about this time, Deputy Whitaker placed both hands around Hanson's neck in an apparent chokehold. This continued for nearly a minute, despite Hanson's lack of, or at least minimal, resistance. Whitaker appeared to continue his grasp after the deputies placed Hanson in a restraint chair. At one point, a deputy told Hanson to "stop," and Hanson muddled that he would not, but the video shows no sign of a struggle or active resistance. Ultimately, the deputies and officers secured Hanson in the restraint chair within a couple of minutes after Staggs's initial contact with him.

After Hanson was placed in the restraint chair, Officer Adkins testified that he continued to be verbally combative. Periodically, he taunted the officers, urging them to do various things, such as "choke me out." At some point, the deputies moved him to the property room, purportedly so **[\*525]** they could monitor him on video. Curiously, however, the defendants did not produce any video or audio from the property room during discovery. Later on, deputies moved Hanson from the property room to a cell. Deputy Jason Rawlins testified that he "took a chair in and sat down beside Mr. Hanson and tried to talk him down because I was the only one in the facility that he had not had contact with." In Rawlins's view, Hanson "[w]ouldn't have any of it," and continued to be "very combative."

Nearly twenty minutes later, Deputies Staggs, Whitaker, Napier, and Rawlins convened in the hallways. Deputies Staggs and Napier put on black, latex gloves. All four deputies walked towards Hanson's cell. Then, Deputies Staggs, Whitaker, and Napier entered the cell while Deputy Rawlins stood in the doorway. Ten seconds later, Deputy Rawlins walked back to the booking desk and Lieutenant Dena Bell handed Deputy Rawlins what appears to be a white ammonia stick,1 who then walked back down the hall and handed it to Deputy Whitaker. A couple minutes later, all four deputies exited the room. As Hanson notes, it appears that Deputy Napier had a black object in his hand that could have been a taser. Deputy Whitaker then handed the ammonia stick to Deputy Staggs, who threw it in the garbage and closed the door.

During this time, deputies apparently had removed Hanson from the restraint chair because he had been **[\*\*4]** approaching the maximum time, per county policy, that he could remain in the chair. Deputy Whitaker testified that Hanson continued to be physically combative and disruptive after being released from the restraint chair.

During this intervening period, deputies took various actions, such as opening the top of the door, reaching into the cell, and bending down. The deputies' actions suggest that Hanson was lying down. Hanson now says that he could have been pepper sprayed at various points during this timeframe. A few minutes later, one of the deputies shook his leg in front of the camera, which Hanson suggests was done to make fun of him. The two deputies again opened the door a few seconds later.

Finally, there was a brief lull in the action.

Deputy Whitaker testified that Hanson was beating on the door to his cell to the point where Hanson was a danger to himself. Whitaker testified he opened the door to check on Hanson. When Deputy Whitaker attempted to close the door, Hanson apparently pushed the door open once, initially blocking Whitaker's ability to close the cell door. Whitaker testified he asked Hanson to stop several times before deploying his pepper spray to compel Hanson to comply. This particular encounter lasted approximately one minute and ten seconds. However, Deputy Rawlins testified that Hanson was sprayed because he was "beating the door," not because he tried to keep it open. It appears that the video shows Hanson clearly impeding the door only once. At that time, Hanson was on the floor. And, the view from the video does not show Hanson being pepper sprayed, but for the same reason does not rule it out.2

Hanson's testimony differs. He testified that at some point, he woke up and heard, "he's a tough one," and recalled being **[\*526]** repeatedly pepper sprayed by deputies—the same deputies who later tased him. He testified that he never banged on the cell door or recalled having tried to open the door. He claimed that the deputies used almost an entire can of pepper spray on him. And, in his view, the video does not depict Hanson's resistance, save for "a short

© 2019 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

scene that depicts Hanson's hand on the door, as he is laying down, obviously in need of assistance." Thereafter, he testified he was dragged down the hallway to be decontaminated in the shower cell from the pepper spray.

Hanson testified that after being taken down the hallway, Deputy Rawlins pinned his right arm against the shower cell wall, Deputy Whitaker pinned his left arm against a wall, while Deputy Napier tased Hanson. Hanson testified that he could not see clearly. He testified that he was tased ten (10) or so times in half a minute, in "drive stun mode." After the alleged repeated tasing, Hanson tried to grab the taser to stop the injury, and asked, "[W]ould you please fucking stop sir?" Deputies then pushed him and he fell. When asked what injuries occurred as a result of this incident, he explained that he had injuries to his hands and a torn tricep from the amount of force applied to restrain him while tasing. Hanson testified that the deputies left him in the shower cell overnight. **[\*\*5]**

The next morning, a probation officer noticed Hanson needed medical attention, and intervened with a judge to affect his release. Hanson testified that, throughout the night, he had repeatedly requested medical care from various jail staff, which went unanswered.

Several comments captured on video over the course of the night, while perhaps minimally relevant under an objective standard of review, add an unpleasant gloss to this case. A few examples. Deputy Whitaker at one point exclaimed: "We don't take really kindly to people on that side of the counter cussing at us." He later talked about how he did not like "redCase headed dudes," and joked that he already has his "white T-shirt" on in case he was arrested, stating "we're all fired anyway, we don't care to whip his ass tonight." Before he left, Officer Gray told Officer Adkins, "Let me get out of here before I get indicted." He indicated alarm by imitating Deputy Whitaker's chokehold with a facial expression of concern, to which Officer Adkins responded, "Very bad." The deputies also reviewed the video of the initial incident, attempting to come up with a uniform story.

By the time Hanson left the jail the next morning, he was in bad shape. Two of Hanson's friends picked Hanson up, and then rushed him to Baptist Health Hospital in Richmond, Kentucky. Hanson was hospitalized for several days. He had to receive blood thinners for potential clots and pain medication. His injuries were apparently significant—ranging from contusions to strains to nerve damage. To this day, he claims he has lasting effects of joint pain and nerve damage on the right side of his body and will require neck surgery in the foreseeable future.

\*\*\*\*

In March 2014, Hanson filed suit in the United States District Court for the Eastern District of Kentucky, which referred the case to a magistrate judge after the parties consented. Several months later, Hanson filed his final amended complaint, which is operative for purposes of this appeal.

After a battery of motions, the district court granted summary judgment in favor of the defendants on all claims. Hanson filed a motion to amend judgment, which **[\*527]** the district court denied. Hanson now appeals.

## II. LEGAL FRAMEWORK: SUMMARY JUDGMENT

Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) . "The burden is generally on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by 'showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Bennett v. City of Eastpointe*, 410 F.3d 810 , 817 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 , 325 , 106 S. Ct. 2548 , 91 L. Ed. 2d 265 (1986)). Once the moving party has carried its burden, the nonmoving party must set forth specific facts, supported by record evidence, showing a genuine issue for trial exists. Fed. R. Civ. P. 56(c) .

The facts and the inferences drawn therefrom must be viewed in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 , 255 , 106 S. Ct. 2505 , 91 L. Ed. 2d 202 (1986). "The evidence of the non- **[\*\*6]** movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* (citing *Adickes v.*

*S.H. Kress & Co.,* 398 U.S. 144 , 158-59 , 90 S. Ct. 1598 , 26 L. Ed. 2d 142 (1970)). Even so, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris,* 550 U.S. 372 , 380 , 127 S. Ct. 1769 , 167 L. Ed. 2d 686 (2007).

"[W]here, as here, there is 'a videotape capturing the events in question,' the court must 'view[] th[ose] facts in the light depicted by the videotape.'" *Green v. Throckmorton,* 681 F.3d 853 , 859 (6th Cir. 2012) (second alteration in *Green*) (quoting *Scott,* 550 U.S. at 378-81 ). However, where the video does not tell the whole story in a material respect, or "reasonable jurors could interpret the video evidence differently," summary judgment is not appropriate. Id. at 865 . Moreover, "[e]ven if part of [a party]'s testimony is blatantly contradicted by [an] audio [or video] recording, that does not permit the district court to discredit his entire version of the events." *Coble v. City of White House,* 634 F.3d 865 , 870 (6th Cir. 2011). In other words, that a recording blatantly contradicts a party's "[*exact*] version of the events," or certain parts of his version, is not alone fatal at summary judgment. A recording must blatantly contradict a party's "*entire* version of the events" in material respects to each claim. *Id* . (emphasis added).

In sum, "it is clear enough . . . that at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249 . The ultimate question, then, is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that [the moving] party must prevail as a matter of law." Id. at 251-52 .

## III. ANALYSIS: INDIVIDUAL LIABILITY

### A. Legal Framework: Fourth Amendment Excessive Force

In this case, Hanson has alleged excessive force claims against several individual **[*528]** officers under the Fourth Amendment .3 The Sixth Circuit has long adhered to the view that the Fourth Amendment prohibits excessive force under certain pre-trial circumstances. *See, e.g., McDowell v. Rogers,* 863 F.2d 1302 , 1306 (6th Cir. 1988).4 "Fourth Amendment protections do not vanish at the moment of arrest." *Aldini,* 609 F.3d at 865 . Instead, Fourth Amendment protections, including those against excessive force, "continue during booking" and at all times "prior to a probable-cause hearing." Id. at 865, 867 .

Hanson's Fourth Amendment claims are governed by an objective reasonableness standard. *See* id. at 865 .5 That is, "[t]he officer's subjective intentions are irrelevant to the Fourth Amendment inquiry." *Phelps,* 286 F.3d at 299 ; *see Kingsley,* 135 S. Ct. at 2472-73 . Thus, while Hanson points to "several comments" captured on video "that provided insight into the deputies' intent, beliefs, feelings, and expectations regarding their interactions with Hanson," these references, insofar as they are relevant to prove intent, are not relevant to our objective inquiry. Nevertheless, certain comments remain relevant as to whether excessive force in fact occurred.

The objective reasonableness **[**7]** standard "turns on the 'facts and circumstances of each particular case.'" *Kingsley,* 135 S. Ct. at 2473 (quoting *Graham,* 490 U.S. at 396 ). "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id* . "A court must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id* . (alterations in *Kingsley*) (quoting *Bell v. Wolfish,* 441 U.S. 520 , 540 , 547, 99 S. Ct. 1861 , 60 L. Ed. 2d 447 (1979)); *see Phelps,* 286 F.3d at 299 (noting the standard requires "deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case").

Under this standard, courts assess the totality of the circumstances. *See Graham,* 490 U.S. at 397 . The Supreme Court has recently detailed non-exclusive "[c]onsiderations" that "may bear **[*529]** on the reasonableness or unreasonableness of the force used" in the pre-trial context: (1) "the relationship between the need for the use of force and the amount of force used"; (2) "the extent of the plaintiff's injury"; (3) "any effort made by the officer to temper or to

limit the amount of force"; (4) "the severity of the security problem at issue"; (5) "the threat reasonably perceived by the officer"; and (6) "whether the plaintiff was actively resisting." *Kingsley*, 135 S. Ct. at 2473 (citing *Graham*, 490 U.S. at 396 ).

## B. Legal Framework: Qualified Immunity

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800 , 818 , 102 S. Ct. 2727 , 73 L. Ed. 2d 396 (1982). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731 , 743 , 131 S. Ct. 2074 , 179 L. Ed. 2d 1149 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335 , 341 , 106 S. Ct. 1092 , 89 L. Ed. 2d 271 (1986)).

"Once the defendant raises a qualified-immunity defense, the burden shifts to the plaintiff to demonstrate both [1] that the challenged conduct violated a constitutional or statutory right, and [2] that the right was so clearly established at the time of the conduct 'that every reasonable official would have understood that what he [was] doing violate[d] that right.'" *T.S. v. Doe*, 742 F.3d 632 , 635 (6th Cir. 2014) (third and fourth alterations in *T.S.*) (quoting *al-Kidd*, 563 U.S. at 741 ). However, the Supreme Court "continue[s] to stress that lower courts 'should think hard, and then think hard again,' before addressing both qualified immunity and the merits of an underlying constitutional claim." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577 , 589 n.7, 199 L. Ed. 2d 453 (2018) (quoting *Camreta v. Greene,* 563 U.S. 692 , 707 , 131 S. Ct. 2020 , 179 L. Ed. 2d 1118 (2011)).

## C. Analysis

Hanson has asserted various Fourth Amendment excessive force claims over a few-hour period while he remained in custody. The parties dispute six discrete uses of force on appeal: (1) the initial shove into the wall; (2) the [**8] attempts to regain control and secure Hanson to the restraint chair; (3) the chokehold; (4) the extended use of the restraint chair; (5) the use of pepper spray; and (6) the use of a taser. Thus, we analyze each claim in chronological "segments." *Dickerson v. McClellan*, 101 F.3d 1151 , 1162 (6th Cir. 1996); *see, e.g., Gaddis v. Redford Twp.*, 364 F.3d 763 , 772 (6th Cir. 2004) ("In this circuit, courts faced with an excessive force case that involves several uses of force must generally 'analyze the . . . claims separately.'") (alteration in *Gaddis*) (quoting *Dickerson*, 101 F.3d at 1162 ). The parties also dispute whether supervisory liability should attach and whether state-law claims should survive. We analyze these issues separately.

### 1. Initial Shove into the Wall—Deputy Staggs

In the light depicted by the videotape, Deputy Staggs's initial use of force against Hanson appears "unreasonable" at first blush. The question, though, is whether the split-second shove depicted in the video was 1) excessive and 2) objectively unreasonable. We think not.

[*530] "There is, of course, a *de minimis* level of [force] with which the Constitution is not concerned." *Wolfish*, 441 U.S. at 539 n.21 (quoting *Ingraham v. Wright*, 430 U.S. 651 , 674 , 97 S. Ct. 1401 , 51 L. Ed. 2d 711 (1977)). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (internal citation and quotation marks omitted); *see also Wilkins v. Gaddy*, 559 U.S. 34 , 38 , 130 S. Ct. 1175 , 175 L. Ed. 2d 995 (2010) (quoting *Hudson v. McMillian*, 503 U.S. 1 , 9 , 112 S. Ct. 995 , 117 L. Ed. 2d 156 (1992)) (noting under the Eighth Amendment that "[a]n inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim"); *Hudson*, 503 U.S. at 9 (noting under the Eighth Amendment that not "every malevolent touch by a prison guard gives rise to a federal cause of action").6

Thus, the constitutional floor against excessive force is not consonant with common-law assault. *See Wolfish*, 441 U.S. at 539 n.21; *Wilkins*, 559 U.S. at 38 . That is, even where a suspect does not actively resist, the use of force must cross the *constitutional* line. *See, e.g., Leary*, 528 F.3d at 443 (holding an officer's strike of a non-resisting pretrial

detainee—"'[i]n the back of the neck' with the side of his hand, performing 'a karate chop kind of a deal'—was *de minimis*," and thus did not violate the Constitution).

The video footage of the initial segment reflects that Deputy Staggs used a split-second "push or shove" that did not cross the *constitutional* line. *Graham*, 490 U.S. at 396 (quoting *Johnson v. Glick*, 481 F.2d 1028 , 1033 (2d Cir. 1973)); *see, e.g., Leary*, 528 F.3d at 443 ; *Nolin v. Isbell*, 207 F.3d 1253 , 1255 , 1257 , 1259 (11th Cir. 2000) (finding force to be *de minimis*, and thus not excessive under the Fourth Amendment , where an officer grabbed the plaintiff "from behind by the shoulder and wrist, threw him against a van three or four feet away, kneed him in the back and pushed his head into the side of the van, searched his groin area in an uncomfortable manner, and handcuffed him").

But even if the force was not *de minimis*, when balancing the *Kingsley* factors, considering the totality of the circumstances and the level of force used, Deputy Staggs's shove was not objectively unreasonable.

In one sense, Hanson did not seem to pose any direct physical threat to the officers. Yet, as the video illustrates, he abruptly turned with an [**9] item still in his hand and yelled with a more aggressive tone, "I'm not dropping no fucking attitude!" As the district court noted, the defendants uniformly perceived "Hanson as taking a 'combative or aggressive stance,'" which does not seem like an objectively unreasonable perception. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97 .

[*531] "Active resistance to an officer's command can legitimize" even higher levels of force, such as "an officer's use of a Taser." *Goodwin v. City of Painesville*, 781 F.3d 314 , 323 (6th Cir. 2015) (citing *Hagans v. Franklin Cty. Sherriff's Office*, 695 F.3d 505 , 509 (6th Cir. 2012)). "Such resistance can take the form of 'verbal hostility' *or* 'a deliberate act of defiance.'" *Id* . (emphasis added) (quoting *Eldridge v. City of Warren*, 533 F. App'x 529 , 534-35 (6th Cir. 2013)).

To be sure, the level of resistance in cases such as *Goodwin*, 781 F.3d at 323 (stating once that he would not comply with an order to exit his home) and *Eldridge*, 533 F. App'x at 533 (failing to comply with orders to exit his vehicle) was at least arguably higher than in this case—but so too was the level of force, *Goodwin*, 781 F.3d at 318 (tasing arrestee for 26 seconds, during which he "began foaming at the mouth, stopped breathing, and went into cardiac arrest"); *Eldridge*, 533 F. App'x at 531 (tasing plaintiff, throwing him to the ground, and placing knee on his neck while he "was suffering from a hypoglycemic episode").

Officers had the right to move the booking process forward. We note that Hanson profanely argued with deputies; refused to cooperate and answer basic intake questions; demanded to press charges against another individual despite being told he could not do so at that time; slammed items on the intake table; verbally refused to obey an officer's command; and crucially, turned toward the officer with an item in his right hand (that he had been instructed to hand over but refused), responding "I ain't dropping no fucking attitude!"7 And, in light of the Supreme Court's calculation that "the extent of the plaintiff's injury" is relevant to a court's assessment of whether a constitutional violation occurred, *see Kingsley*, 135 S. Ct. at 2473 ,8 we also note that Hanson has not suggested any of his injuries were caused during this segment—a split-second shove into the wall.

This is not to say that, in hindsight, Deputy Staggs exhibited the utmost patience. This is not to say that, in hindsight, Staggs exhibited the finest judgment. But we cannot conclude a split-second shove was objectively unreasonable under these circumstances.

Finally, we note the Sixth Circuit has held force like that applied to Hanson constitutionally justified under similar circumstances. *See Lee v. City of Norwalk*, 529 F. App'x 778 , 782-83 (6th Cir. 2013) (finding no constitutional violation where an officer "took hold of [the suspect's] sleeves . . . then applied force to her neck with his forearm" where the suspect "was belligerent and confrontational throughout her time in the booking area"). At some [*532] point, in response to defiance and belligerence, officers [**10] are entitled to "preserve internal order and discipline." *See Bell*, 441 U.S. at 547 . At a minimum, then, the law did not clearly establish the unlawfulness of the initial shove.9

© 2019 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Thus, we affirm the district court's holding that Deputy Staggs's initial use of force was not objectively unreasonable under the Fourth Amendment .

### 2. Attempts to Regain Control and Secure to the Restraint Chair—Deputy Napier

Hanson half-heartedly argues that Deputy Napier and perhaps others used excessive force during a two-minute period after Deputy Staggs had pushed Hanson into the wall. However, none of the officers—save Deputy Whitaker, who we will focus on next—used any measurable force, let alone unconstitutionally excessive force, during this segment. Even if Deputy Staggs had used excessive force from the initial push, Hanson's initial refusal to cease resistance justified other officers' attempts to regain control. *Cf. Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539 , 1546 , 198 L. Ed. 2d 52 (2017) (rejecting the Ninth Circuit's "provocation rule" that had permitted an excessive force claim under the Fourth Amendment where an officer provokes a confrontation if the provocation was an independent Fourth Amendment violation). Thus, the officers' subsequent actions to restrain Hanson—apart from the extended chokehold—were unquestionably justified under the Constitution.

### 3. Chokehold—Deputy Whitaker

With respect to Deputy Whitaker, by contrast, the actions displayed on the video auger in favor of Hanson at the summary-judgment stage.

The video demonstrates Deputy Whitaker placed both his hands around Hanson's neck in a chokehold after other officers secured him from behind. And, yet, Deputy Whitaker kept his hands in a "chokehold" position for up to a minute when he finally released his right arm. While some audio evidence indicates that Hanson may have remained slightly resistive later on, the video shows that officers retained complete control while Deputy Whitaker continued to choke Hanson. Moreover, the audio reflects that Hanson sporadically "gurgled"—a disturbing fact that the deputies fail to address. When viewing the video and hearing audio of Hanson "gurgling," a jury could conclude Deputy Whitaker's chokehold was unconstitutional excessive force.

In addition, assuming Hanson had "stopped resisting," *Rudlaff v. Gillispie*, 791 F.3d 638 , 642 (6th Cir. 2015), which a jury could conclude from the video, Deputy Whitaker was on sufficient notice that continuing to choke Hanson violated clearly established law. *See, e.g.*, *Griffith v. Coburn*, 473 F.3d 650 , 657 , 660 (6th Cir. 2007) ("[I]f the jury concludes that [the officer] used the neck restraint without an objectively reasonable belief that [the suspect] posed a threat of serious bodily injury, then it is obvious to us that 'no reasonable officer could believe that such [use of force] would not violate another's constitutional rights'") (fourth alteration in *Griffith*) (quoting *Brandenburg v. Cureton*, 882 F.2d 211 , 216 (6th Cir. 1989)); *Coley v. Lucas Cty.*, 799 F.3d 530 , 540-41 (6th Cir. 2015) (citing *Valencia v. Wiggins*, 981 F.2d 1440 , 1447 (5th Cir. 1993)) ("The use of a chokehold on an unresisting—and even an initially resistant—detainee violates the **[\*533]** [Constitution].").10 **[\*\*11]** Here, Hanson posed no apparent threat to the officers and remained restrained, in a "nelson"-like position, from behind. Again, "assuming [Hanson] was choked after being subdued, a jury could reasonably find that [Deputy Whitaker] used excessive force." *Dixon v. Cty. of Roscommon*, 479 F. App'x 680 , 683 (6th Cir. 2012) (per curiam).

Moreover, in contrast to a shove, *see supra* Part III.C.1, we note that choking a suspect for nearly a minute is equal to or greater than the level of force used with a taser. *See Griffith*, 473 F.3d at 657-58 (noting the record showed a "neck restraint" was similar to batons or tasers along the "force continuum"); *cf. Hagans*, 695 F.3d at 510 (noting that "tasers carry 'a significantly lower risk of injury than physical force' and that the vast majority of individuals subjected to a taser—99.7%—suffer no injury or only a mild injury" (quoting academic study)). If an officer cannot tase a "non-resistant person" "[a]bsent some compelling justification—such as the potential escape of a dangerous criminal or the threat of immediate harm," *Austin v. Redford Twp. Police Dep't*, 690 F.3d 490 , 498 (6th Cir. 2012) (quoting *Kijowski v. City of Niles*, 372 F. App'x 595 , 600 (6th Cir. 2010)), then he cannot choke a "non-resistant person" for an extended period of time.

### 4. Extended Use of the Restraint Chair—Deputies Napier, Staggs, Whitaker, and Lieutenant Bell

© 2019 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Hanson now attempts to argue that the "continued use of force against Hanson by keeping him in the restraint chair for three hours likewise was unreasonable, and unconstitutional, since it flowed from the same unlawful, excessive, force." However, the district court found Hanson failed to allege in his second amended complaint any constitutional violation stemming from the use of the restraint chair. *Hanson, 2017 U.S. Dist. LEXIS 8867* , [2017 BL 18618], 2017 WL 342051 , at *13 n.19. We agree. Hanson merely alleged that the deputies were "negligent" in their restraint, not that the use of the restraint chair violated the Constitution. Further, Hanson's attempts at resuscitating this claim fail. Even if the use of the restraint chair "featured prominently" in his (unverified) complaint, "feature[d] prominently" in his "own Motion for Summary Judgment," and "was mentioned in response to the Motion for Summary Judgment," Hanson failed to meet his burden on summary judgment to establish that the extended use of a restraint chair violated clearly established law. And he also insufficiently develops this argument on appeal. "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation," like here, "are deemed waived." *Barany-Snyder v. Weiner*, 539 F.3d 327 , 331 (6th Cir. 2008) (alteration in original) (quoting *McPherson v. Kelsey*, 125 F.3d 989 , 995-96 (6th Cir. 1997)).

### 5. Use of Pepper Spray—Deputies Napier, Rawlins, Staggs, and Whitaker 11

For the first time on appeal, Hanson argues that a jury could conclude that [*534] he was gratuitously pepper sprayed. As the district court noted, "Plaintiff did not contest or oppose summary judgment as to this claim." *Hanson, 2017 U.S. Dist. LEXIS 8867* , [2017 BL 18618], 2017 WL 342051 , at *13 n.20. Indeed, in Hanson's response to the motion for summary judgment, the word "spray" only appears once, buried in an incoherent sentence discussing various jail standards.12

Our general rule is "that an argument not raised before the district court [**12] is waived on appeal to this Court." *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546 , 552 (6th Cir. 2008); *see also Bldg. Serv. Local 47 Cleaning Contractors Pension Plan v. Grandview Raceway*, 46 F.3d 1392 , 1399 (6th Cir. 1995) (noting "vague references fail to clearly present the objection in the district court so as to preserve the issue for appellate review").13

"The need for finality in litigation and conservation of judicial resources counsels against exceptions." *Hicks v. Gates Rubber Co.*, 928 F.2d 966 , 971 (10th Cir. 1991). Nevertheless, "[we] have, on occasion, deviated from the general rule in 'exceptional cases or particular circumstances' or when the rule would produce 'a plain miscarriage of justice.'" *Foster*, 6 F.3d at 407 (quoting *Pinney Dock & Transport Co. v. Penn Cent. Corp.*, 838 F.2d 1445 , 1461 (6th Cir. 1988)); *accord Scottsdale Ins.*, 513 F.3d at 552 .

In *Lexicon, Inc. v. Safeco Insurance Co. of America*, for example, this Court determined that since "the district court fully addressed" arguments raised for the first time in a sur-reply brief and "both parties fully briefed the issue before this court," it would address an argument. 436 F.3d 662 , 670 n.6 (6th Cir. 2006). Under these three types of circumstances, the three policies justifying the invocation of the waiver rule are not advanced. First, where a district court "fully addresse[s]," *id* ., an argument—whether or not a party below fully raised it in an appropriate fashion—our consideration of that argument is not made more difficult. *See Scottsdale*, 513 F.3d at 552 . In these cases, we have the district court's order and subsequent briefing on appeal. Second, we do not "[dis]respect . . . the district court" by reversing it on a basis that it never had considered because the district court, in fact, ruled on that very issue. *See Hicks*, 928 F.2d at 970 . And, third, the negatively affected party is not "surprised . . . on appeal" because it has every chance to argue the district court erred, *see Scottsdale Ins.*, 513 F.3d at 552 , and that party can still argue the court erred by raising an argument on its own without allowing an opportunity to respond. *See* Fed. R. Civ. P. 56(f) ("After giving *notice and a reasonable time to respond*, the court may . . . grant the motion on grounds not raised by a party.") (emphasis added).

We also note that the failure to respond *at all* at summary judgment is not necessarily fatal to a plaintiff's claims. *See, e.g., Carver v. Bunch*, 946 F.2d 451 , 455 (6th Cir. 1991) ("[A] district court cannot grant [*535] summary judgment in favor of a movant simply because the adverse party has not responded."); *see also* Fed. R. Civ. P. 56(c) , (e) . Rather, "a party moving for summary judgment *always* bears the burden of demonstrating the absence of a genuine issue as to a material fact." *Carver*, 946 F.2d at 454 (emphasis added) (citing *Adickes*, 398 U.S. at 157 ). It follows that an unsupported and poorly developed response to a motion for summary judgment is also not necessarily fatal to the

© 2019 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

non-movant, and the non-movant can still argue on appeal that the movant failed to meet his burden in the first instance.

Notwithstanding Hanson's failure to respond to the motion for summary judgment as to this claim below, the district court relied on the video to address this claim (at least as to Deputy Whitaker), and the parties both fully briefed this claim on appeal. *See Scottsdale Ins.*, 513 F.3d at 552 . In addition, Deputy Whitaker does not argue that the claim [**13] against him is waived. *Cf. Fagan v. Washington*, 942 F.2d 1155 , 1157 (7th Cir. 1991) (noting a party under certain circumstances can "waive[] waiver"). Thus, we will at least consider the claim as to Deputy Whitaker. With respect to the other deputies, waiver presents a much closer call.

We note that the district court acknowledged and cited to Hanson's deposition testimony in its recitation of the facts. *Hanson*, 2017 U.S. Dist. LEXIS 8867 , [2017 BL 18618], 2017 WL 342051 , at *3. Hanson testified that multiple deputies gratuitously pepper sprayed him. But the district court did not credit Hanson's testimony, and instead used one window in the video to conclude it "clearly supports Defendants' version of events." *2017 U.S. Dist. LEXIS 8867* , [WL] at *13. Hanson has not cited any new evidence that the district court did not consider, and he has not argued any new theory regarding excessive force or claim that the deputies did not attempt to defeat below. And the deputies and the district court were aware of Hanson's testimony that multiple deputies used pepper spray on him. Thus, we decline to invoke waiver under these circumstances and will review the district court's decision to see whether the other deputies indeed carried their burden at summary judgment to establish that no genuine issue of material fact exists. *See Carver*, 946 F.2d at 455 ("The court is required, at a minimum, to examine the movant's motion for summary judgment to ensure that he has discharged [his] burden.").

Hanson testified that at some point, he woke up to "smelling salts" (likely the ammonia stick), and heard, "he's a tough one." He then recalled being repeatedly pepper sprayed by deputies—the same deputies who later tased him. He testified that he never banged on the cell door or recalled having tried to open the door. He claimed that the deputies used almost an entire can of pepper spray on him. And, in his view, the video does not depict Hanson resisting at all after being placed in the cell, save for "a short scene that depicts Hanson's hand on the door, as he is laying down, obviously in need of assistance." Thereafter, he testified he was dragged down the hallway to be decontaminated from the pepper spray.

The deputies' accounts differ. Deputy Whitaker testified that Hanson was beating on the door to his cell to the point where Hanson was a danger to himself. Deputy Whitaker claimed he opened the door to check on Hanson. When Whitaker attempted to close the door, Hanson pushed the door open, blocking Whitaker's ability to close the cell door. Whitaker testified that he asked Hanson to stop several times before deploying his pepper spray to compel Hanson to comply. This particular encounter lasted approximately [*536] one minute and ten seconds. Interestingly, however, Deputy Rawlins testified that Hanson was sprayed because he was "beating the door," not because he tried to keep it open.

We conclude the video does not "blatantly contradict" Hanson's entire testimony. The video shows Hanson clearly impeding the door's closing only once. This snapshot also appears to corroborate the plaintiff's view that Hanson is lying down at that time. The door does seem to swing open in a few small bursts over the next many seconds, [**14] but it's not clear why. We cannot conclude that the video blatantly contradicts Hanson's testimony that he was gratuitously pepper sprayed while non-resistive.

Hanson also suggests that the deputies could have pepper sprayed him at other times outside this timeframe. After careful review of the video footage, we agree.

The most plausible window appears to be when Deputies Staggs, Napier, and Whitaker enter Hanson's cell with the ammonia stick. During this time, Deputy Rawlins can be seen at the doorway. If Hanson was actively resisting, he almost assuredly would have entered the room to assist. The deputies exit over two minutes later—plenty of time for them to have gratuitously pepper sprayed (and tased) Hanson. And, as we will discuss later, it appears that Deputy Napier had a taser in hand during this time period.

The deputies argue that Hanson's citation to other windows of opportunity as reflected in the video does not suffice as "affirmative evidence showing a genuine issue of material fact." But this argument misses the mark. For starters, a party need not produce "affirmative evidence." Rather, he can "assert[] that a fact . . . is genuinely disputed" by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1) . In this case, Hanson has shown that the video in its entirety does not "establish the absence . . . of a genuine dispute." *Id* . Moreover, and crucially, there *was* affirmative evidence in the record that the district court considered—Hanson's sworn testimony. To be sure, Hanson's briefing below did not pinpoint the other windows of opportunity shown in the video in the thorough manner he does on appeal. But neither did the deputies establish the video in its entirety "discredited" Hanson's "entire version of the events" as reflected in his testimony. *Coble*, 634 F.3d at 870 . In short, the deputies failed to carry their initial burden at summary judgment to demonstrate that the video in its entirety blatantly contradicted Hanson's sworn testimony.

To be sure, other windows do not dovetail with Hanson's sequencing—recall, he testified that he was pepper sprayed right before being dragged down the hallway. In this sense, the video "discredits his [*exact*] version of the events." *Id* . But that is not the standard. A few inconsistencies fail to "discredit [Hanson's] *entire* version of the events." *Id* . (emphasis added).14

All agree that deputies pepper sprayed Hanson. The *material* question, then, taking the use of pepper spray as given, is [*537] could a reasonable jury conclude that Hanson was *gratuitously* pepper sprayed? Although Hanson's testimony has many potential flaws, yes. *See id* . Assuming so, the law had long placed the deputies on notice that such behavior was unlawful. *See, e.g., Adams v. Metiva*, 31 F.3d 375 , 386-87 (6th Cir. 1994) ("If the jury determines that Metiva . . . gratuitously maced a helpless and incapacitated person, then as a legal matter no reasonable officer would believe that such conduct would not violate plaintiff's constitutional rights.").

### 6. Use of Taser—Deputies Napier, Rawlins, and Whitaker

The district court's analysis regarding the use of the taser suffered [**15] from the same deficiencies as its analysis regarding the use of pepper spray. Let's recap the record.

Hanson testified that about fifteen seconds after he was pepper sprayed, Deputy Rawlins pinned his right arm against the shower cell wall, Deputy Whitaker pinned his left arm against a wall, while Deputy Napier tased Hanson. Hanson testified that he could not see clearly. He testified that he was tased ten (10) or so times in half a minute, in "drive stun mode." After the alleged repeated tasing, Hanson tried to grab the taser to stop the injury, and asked, "[W]ould you please fucking stop sir?" Deputies then pushed him, and he fell. When asked what injuries occurred as a result of this incident, he explained that he had injuries to his hands and a torn tricep from the amount of force applied to restrain him while tasing.

The district court bought the deputies' conflicting testimony, partially corroborated by one portion of the video, and refused to credit *any* of Hanson's version of the events for several reasons. The district court noted that Hanson "has given wildly disparate estimates of taser frequency (initially 3, then, 5, then 10) and bodily location." Moreover, "[b]ecause he admits to significant gaps in recollection from the night, because his recollections have been so inconsistent, and because the story he told fails to match objective portions of the video," the court found "Hanson's tale as to the tasing wholly contradicted by the record."

The court inappropriately "discredit[ed] [Hanson's] entire version of the events." *Coble*, 634 F.3d at 870 . Just like with the pepper-spray incident, let's start with what the parties agree on: Hanson was tased. Hanson testified he was tased ten times,15 while Deputies Napier and Whitaker testified Hanson was tased once. The taser incident was not captured on camera. The question thus boils down to whether the district court properly could discredit Hanson's deposition testimony that he was gratuitously tased multiple times.

In rare cases, "testimony can and should be rejected without a trial if, in the circumstances, no reasonable person would believe it." *Seshadri v. Kasraian*, 130 F.3d 798 , 802 (7th Cir. 1997). However, "proof that a party . . . has made



prior inconsistent statements is not a rare event in our courts. Juries are regularly called upon to consider evidence of that sort, and we all know that prior inconsistency does not inexorably lead to defeat." *Norris v. Sysco Corp.*, 191 F.3d 1043 , 1049 (9th Cir. 1999). [*538] Moreover, "[a]n affiant's prior statements cannot be equated to either a deposition, which is under oath, Fed. R. Civ. P. 30(c) , or to a judicial admission, as in a pleading, which is binding." *Seshadri*, 130 F.3d at 801 .

Because the video does not blatantly contradict Hanson's sworn testimony that he was tased ten times, his testimony *must* be credited at summary judgment. In evaluating Hanson's prior inconsistent statements, the district court improperly made a "[c]redibility determination[]" in this regard at summary judgment. *See Anderson*, 477 U.S. at 255 .16 Surely, the deputies "can use it to try to discredit the witness's testimony, but the witness may be able to explain it away." *Seshadri*, 130 F.3d at 801 . In this case, for example, Hanson came [**516] into the jail drunk and then allegedly suffered serious injuries over several hours requiring hospitalization over several days. It's easy to see why his recollection under these circumstances would not be perfect or even consistent.

The district court's attempts to poke other holes in Hanson's story, while effective, are not fatal to his claim. The district court noted Hanson's sequencing "fails"; it further concluded Hanson's account for all three officers in the cell at the same time, and thus his account for how he was pinned against the wall, "is inaccurate." This is all fine (at least as it relates to one window of opportunity),17 but the *material* question, in light of multiple taser drives, is could a reasonable jury conclude that Hanson was not "actively resisting" officers' efforts to control him at that time? *See Rudlaff*, 791 F.3d at 642 (collecting cases) ("When a suspect actively resists . . . the police can use a taser (or a knee strike) to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot.").

In this vein, revisiting *Coble* is instructive. There, the court noted that an audio recording did not "blatantly contradict[]" the plaintiff's "entire version of the events." 634 F.3d at 870 . Much of Coble's testimony was not supported by an audio recording, including the absence of any screams or the sound of his body hitting the pavement. Id. at 869 . Nonetheless, "[e]ven if part of Coble's testimony is blatantly contradicted by the audio recording," the Court wrote, "that does not permit the district court to discredit his entire version of the events." Id. at 870 . "We allow cases to proceed to trial even though a party's evidence is inconsistent, because '[i]n reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited.'" *Id* . (alteration in original) (quoting *Schreiber v. Moe*, 596 F.3d 323 , 333 (6th Cir. 2010)).

The deputies note *Coble* is factually distinguishable; but *Coble* 's bottom-line conclusion is legally inescapable: even *if* the video "blatantly contradicted" "*part* of Coble's testimony," the district court could not "discredit his *entire* version of the events." *Id* . (emphases added). So even if the video showed Hanson errantly recalled [*539] the sequence of events or errantly testified that one additional officer participated, the video simply does not "blatantly contradict" his assertion that he was gratuitously tased multiple times.

Further, there *were* other windows of opportunities where force could have been applied. Notwithstanding partial contradictions involving sequencing or movement down the hallway, it remains possible that Hanson *was* pepper sprayed and tased during a three-minute period where three deputies remained in Hanson's cell. At this juncture, it also bears repeating that Hanson suffered serious injuries during his stay, which required a hospital stay over many days. There is no *res ipsa loquitur* principle for constitutional torts, but a jury's evaluation about whether excessive force took place here seems appropriate considering Hanson's significant injuries and the record's missing puzzle pieces.

In short, [**517] if the jury credited Hanson's testimony that he was gratuitously tased—testimony that the video does not "blatantly contradict" for any segment—then the jury could find Deputies Napier, Rawlins, and/or Whitaker committed an objectively unreasonable constitutional violation.18

### 7. Supervisory Liability—Jailer Thomas and Lieutenant Bell

Last, Hanson argues that Lieutenant Dena Bell and Jailer Doug Thomas should be held individually liable in their supervisory capacities.

Bloomberg Law®

Jailer Thomas merits little discussion. As the district court noted, he was not even on the scene at all relevant times. While in a very rare case, a supervisor does not have to be "physically . . . present at the time of the constitutional violation," *Peatross v. City of Memphis*, 818 F.3d 233 , 242 (6th Cir. 2016), Hanson falls far short of his burden to point to evidence or develop argumentation. The only evidence from the record that Hanson points to is that the supervisor Thomas designated in charge, "Lt. Bell[,] testified that in her entire career, she has never written anyone up for anything." Hanson also points to the fact that "this jail, with this jailer, has been the subject of several civil rights lawsuits," and urges this Court to take "[j]udicial notice . . . as to these other matters." These pieces of evidence fall short of establishing "active unconstitutional behavior," *Bass v. Robinson*, 167 F.3d 1041 , 1048 (6th Cir. 1999), or "a widespread pattern of constitutional violations," *Doe v. Warren Consol. Schs*, 93 Fed. Appx. 812 , 822 (6th Cir. 2004), Hanson's latest attempt at raising an argument not raised before the district court.

The claim against Lieutenant Bell, while it would have been a closer call, also fails. In *Bellamy v. Bradley*, we set the "minimum" bar by announcing "a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." 729 F.2d 416 , 421 (6th Cir. 1984). And, just like with other individual-liability claims, a prior case with a "high 'degree of specificity'" would have had to put Bell on notice that her conduct violated clearly established law. *See Wesby*, 138 S. Ct. at 590 (quoting *Mullenix v. Luna*, 136 S. Ct. 305 , 309 , 193 L. Ed. 2d 255 (2015) (per curiam)). However, as the district [*540] court noted, Hanson did not raise, let alone develop, this argument below.

> Hanson fails to allege any particular misconduct on the part of Lieutenant Bell. He further does not dispute Defendants' assertion of qualified immunity with respect to Bell, having failed to respond in any way to the argument. Simply put, Hanson does not present any evidence that Bell used *any* amount of force against him during his stay at MCDC. . . . Hanson simply does not offer any, much less sufficient, evidence to maintain an excessive force claim against Bell.

*Hanson*, 2017 U.S. Dist. LEXIS 8867 , [2017 BL 18618], 2017 WL 342051 , at *9.

Now, of course, Hanson argues that Lieutenant Bell "clearly has supervisory liability," pointing to caselaw and evidence that would support claims against her. But because the district court was never asked to consider this theory of liability against Lieutenant Bell, we find that Hanson failed to preserve this claim on appeal. *See Scottsdale Ins.*, 513 F.3d at 552 .19

### 8. State-Law Claims [**18]

Hanson's second amended complaint alleges several claims under state law, including common-law and statutory negligence, negligent and intentional inflictions of emotional distress, and assault and battery. The elements for each of these claims do not directly mirror the elements of Hanson's excessive-force claims under the Fourth Amendment , though some of them share a defense insofar as qualified immunity is raised under state and federal law. Hanson, however, failed to respond with any argument to defeat qualified immunity under Kentucky law. This again represents a troubling pattern, relegating this Court to the district court's role in evaluating arguments concerning these issues for the first time. *See Scottsdale Ins.*, 513 F.3d at 552 . But while Hanson's appellate counsel deftly managed to salvage a few of his federal claims, he fails to save his state-law claims. After laying out the general legal standard for qualified immunity under state law, Hanson's entire argument for several complicated state-law claims spans less than a half-page:

> As noted, above the initial use of force by Staggs, Napier, and Whitaker, which, viewed most favorably to Hanson, was in retaliation for the Kentucky comment, violated clearly established constitutional rights. Viewed in the light most favorable to Hanson, because it was in retaliation for the Kentucky comment, they were also taken in bad faith. The unreasonable prolonged confinement in the restraint chair can be likewise seen in a similar lens, implicating Bell and Rawlins as well. And finally, the unnecessary and unconstitutional repeated use of the pepper spray and taser, likewise violated clearly established rights, and can be seen to be retaliatory and in bad faith (and if it is *either*, qualified immunity in Kentucky is not

© 2019 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

applicable).

Appellant's Br. at 50-51. Hanson begins by repeating his argument that several deputies "violated clearly established constitutional rights." But Hanson raised no claim under the Kentucky Constitution. Excising that statement, all we are left with is a **[\*541]** bald allegation for that first time on appeal that officers acted "in bad faith." "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation," like here, "are deemed waived." *Barany-Snyder*, 539 F.3d at 331 (alteration in original) (quoting *McPherson*, 125 F.3d at 995-96 ). Thus, none of Hanson's state-law claims survive.

## IV. ANALYSIS: OFFICIAL CAPACITY CLAIMS

### A. Legal Framework: *Monell* Liability

"A suit against an individual 'in his official capacity' has been held to be essentially a suit directly against the local government unit and can result in that unit's liability to respond to the injured party for his injuries." *Leach v. Shelby Cty. Sherriff*, 891 F.2d 1241 , 1245 (6th Cir. 1989). Thus, each of Hanson's claims are "nothing more than a suit against [Madison] County itself." *Petty v. Cty. of Franklin*, 478 F.3d 341 , 349 (6th Cir. 2007), *overruled on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 , 127 S. Ct. 1955 , 167 L. Ed. 2d 929 (2007).

A governmental entity "cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat **[\*\*19]** superior* theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 , 691 , 98 S. Ct. 2018 , 56 L. Ed. 2d 611 (1978).20 Rather, liability attaches where the unconstitutional action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated" by municipal officers, or where the deprivation results from governmental "custom." Id. at 690-91. The governmental action must be "the moving force" behind the constitutional violation. Id. at 694 .

Finally, where no constitutional violation occurs, the municipal defendant likewise cannot be held liable. *Watkins v. City of Battle Creek*, 273 F.3d 682 , 687 (6th Cir. 2001). Thus, we only analyze those excessive force claims that survive—those encompassing the chokehold, the pepper spray, and the taser.

### B. Analysis

A *Monell* claim comes in three different forms: a "commission," an "omission," or a "ratification." *See Clouthier v. Cty. of Contra Costa*, 591 F.3d 1232 , 1249-50 (9th Cir. 2010), *overruled in part by Castro v. Cnty. of L.A.*, 833 F.3d 1060 (9th Cir. 2010). In this case, Hanson devotes two short paragraphs to his argument that "there was []sufficient proof of a custom or policy of excessive force." Hanson's arguments for this claim—a claim that must eclipse a high bar—"leave the court to 'put flesh on its bones.'" *Brenay v. Schartow*, 709 F. App'x 331 , 336 (6th Cir. 2017) (quoting *McPherson*, 125 F.3d at 995-96 ). But, even assuming these claims are preserved, Hanson's arguments fail.

Hanson cites three pieces of evidence: (1) Lieutenant Bell's testimony that she never disciplined anyone for excessive force; (2) Deputy Napier's and Deputy **[\*542]** Rawlins's testimony that they received no training on the use of force "for a period of time"; and (3) Mr. Miller's expert testimony that "the Kentucky Jail Standards and the Madison County standards were inadequate."21 Hanson then notes that "[w]here a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of the inhabitants there is a 'policy or custom' that is actionable under § 1983 ." This evidence and argumentation do not suffice to sustain a *Monell* claim.

The first piece of evidence offers little. The fact that Lieutenant Bell had not disciplined an officer for excessive force does not show that there was a history of excessive force or need for additional training. In fact, if anything, that evidence standing alone shows there was not a pattern of excessive force. The mere existence of a training program or lack thereof is not sufficient. *See City of Canton v. Harris*, 489 U.S. 378 , 389-90 , 109 S. Ct. 1197 , 103 L. Ed. 2d 412 (1989). There is no constitutional requirement to "train" writ large. *See id.*

The fact that two officers testified that they did not receive training on the use of force upon being hired does not establish that the County's failure to train these officers rose to the level of a "policy" reflecting deliberate indifference.

The record shows that Deputy Napier had, indeed, attended use-of-force training within a couple months of being hired. While Deputy Rawlins did not receive use-of-force training when he started in 2013, and instead received the annual sixteen hours of training the next year, "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten [**20] liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." Id. at 390-91 .

To the extent Deputy Rawlins or others gratuitously used force, their collective "bad judgment," not lack of training, was the moving force behind the constitutional violation. While one could argue that Deputy Staggs's inadvisable chokehold was linked to a lack of proper restraint training, Hanson has still not met his burden to show that a "training program," or lack thereof, amounted to a policy of deliberate indifference. It does not "suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct." Id. at 391 . Even "adequately trained officers occasionally make mistakes." Id .

A Monell claim that survives summary judgment is exceedingly rare, and rightly so. "In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." Id. at 392 . Hanson's evidence [*543] here is simply not sufficient to show the County's "failure to train reflects *deliberate indifference* to the constitutional rights of its inhabitants." Id . (emphasis added).

## V. ANALYSIS: MOTION TO ALTER OR AMEND JUDGMENT

Finally, Hanson alleges that the district court abused its discretion by denying his motion under Fed. R. Civ. P. 59(e) . The denial of a motion under Rule 59(e) is reviewed for abuse of discretion. *See, e.g., Nolfi v. Ohio Ky. Oil Corp.*, 675 F.3d 538 , 552 (6th Cir. 2012). Since we have reviewed each of Hanson's issues de novo, this argument has no traction. For those issues that the district court got right on de novo review, it obviously did not abuse its discretion. For those issues that the district court erred on de novo review, we need not evaluate whether the district court also abused its discretion.

## VI. CONCLUSION

In sum, with respect to Hanson's individual-liability claims, we:

1) affirm the district court's decision to grant Deputy Staggs qualified immunity in connection with his decision to shove Hanson at the booking counter;

2) reverse the district court's decision to grant Deputy Whitaker qualified immunity in connection with his decision to choke Hanson;

3) affirm the district court's decision to grant Deputies Napier and all others qualified immunity in connection with their initial efforts to restrain Hanson;

4) find Hanson waived his claim in connection with the deputies' extended use of the restraint chair;

5) reverse the district court's decision to grant Deputies Napier, Rawlins, Staggs, and Whitaker qualified immunity in connection with the use of pepper spray;

6) reverse the district court's decision to grant Deputies Napier, Rawlins, and Whitaker qualified immunity in connection with the use of a taser;

7) find Hanson waived his claims and/or affirm the district court's decision to grant qualified immunity in connection with Jailer Thomas's and Lieutenant Bell's supervisory [**21] liability; and,

8) find Hanson waived his state-law claims in all respects.



With respect to Hanson's official-capacity claims, we affirm the district court's grant of summary judgment as to Madison County.

With respect to Hanson's motion to alter or amend judgment, we dismiss as moot any objections on appeal because they do not change the outcome of any claim on de novo review.

Therefore, we **AFFIRM IN PART** and **REVERSE IN PART** the district court's judgment and **REMAND** this case for trial on the surviving claims.

KAREN NELSON MOORE (In Part)

KAREN NELSON MOORE (In Part)

**KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part.** I dissent from Part III.C.1, regarding Staggs's use of hands-on force, and Part IV, regarding Hanson's *Monell* claim. I write separately to clarify the evidence before us regarding Napier's use of hands-on force. I agree with the reversal regarding Hanson's claims of excessive force for Whitaker's use of hands-on force; for Staggs's, Whitaker's, Napier's, and Rawlins's use of pepper spray; and for Whitaker's, Napier's, and Rawlins's use of a taser.

### [*544] A. Hands-on Force

Regarding Staggs's use of hands-on force, I disagree with the majority's decision because (1) there is a genuine dispute of material fact regarding whether Staggs's actions were reasonable and (2) Hanson's right is clearly established. Additionally, although I agree with the majority's outcome regarding Napier's use of hands-on force, the evidence shows that Napier did use some force, which is contrary to the majority's assertion.

### 1. Staggs

#### a. Objectively Reasonable

The video evidence shows that Whitaker, Napier, and Staggs were near the booking counter when Hanson first entered the detention center with Adkins. R. 128 (MSJ Ex. 14, Hanson audio.avr at 1:22 a.m.). While entering, Hanson used a raised voice and profanity to discuss his arrest. Id. at 1:23 a.m. But this discussion ended when Hanson began to give his background information to Whitaker, who sat at the booking counter. Id. As Hanson spoke with Whitaker, Staggs removed Hanson's handcuffs. Id. Once Hanson no longer had handcuffs on, Whitaker asked Hanson to take off his jewelry and belt and to remove items from his pockets, which Hanson began to do. Id. at 1:24 a.m. However, while removing items from his pockets, Hanson used profanity and complained about his arrest. Id. After hearing that Adkins arrested him for disorderly conduct, Hanson became agitated. Id. Adkins responded to Hanson by telling him to "take it easy." Id.

Hanson then stated that he was going to press charges against the employee at JerZees who punched him. Id. Adkins told Hanson that Adkins could not do anything about the JerZees employee because Adkins did not see the alleged assault. Id. At one point, Adkins shook his head. Id. Hanson responded to Adkins's reaction by telling Adkins to "do your fucking work man," which caused Whitaker to exclaim "ok, shut your mouth." Id. Napier also interjected at this point by telling Hanson that he "better calm down real fucking quick." Id. As this occurred, Adkins continued to try to explain to Hanson why he could not help Hanson press [**22] charges. Id. Because Hanson kept speaking over Adkins, Adkins asked Hanson if he was from Kentucky, and Hanson responded by saying "no, I'm not from Kentucky, I'm from an educated fucking state." Id. at 1:25 a.m. Throughout this encounter, Hanson made hand gestures, took items out of his pockets, and occasionally smacked his hands and items down on the booking counter. Id. at 1:24 a.m. At times, Hanson's voice was raised and irritated, but he was not yelling. Id.

While Hanson continued to take items out of his pockets and toss them on the counter, he stated that he should call 911 to press charges against the JerZees employee. Id. at 1:25 a.m. When Adkins responded to Hanson's



comments, Hanson stated that "your sitting there, fucking jabbering." *Id.* Because of this statement, Staggs, who stood behind Hanson to the right, told Hanson "you better drop the fucking attitude, alright?" *Id.* After hearing Staggs, Hanson started to move his head and the right side of his body to see Staggs. *Id.* During this movement, Hanson stated "I ain't dropping no fucking attitude." *Id.* But before Hanson finished turning, Staggs grabbed Hanson's throat with his right hand and pushed Hanson against the wall. *Id.* Hanson then shoved Staggs off of him, R. 128 (MSJ Ex. 15, Hanson.avi at 1:24 a.m.), and both men fell through the doorway into the alcohol-testing room, R. 128 (MSJ Ex. 14, Hanson audio.avr at 1:25 a.m.). Napier and Whitaker then rushed to help Staggs. R. 128 (MSJ Ex. 15, Hanson.avi at 1:24 a.m.).

**[\*545]** Then, a while after restraining Hanson, the Deputies discussed the incident, and Bell stated that "we all have them days though, when they get under your skin." R. 128 (MSJ Ex. 14, Hanson audio.avr at 1:50 a.m.). Whitaker said to "be sure when we write the report that we include these two officers," referencing to Adkins and Gray. Id. at 1:55 a.m. Gray responded with "woah, woah, I wasn't here, my name is Zach Harris." *Id.* When Whitaker continued to describe the events, Whitaker stated to Adkins that "we don't take really kindly to people standing on that side of the counter cussing [indiscernible]." Id. at 1:56 a.m.

At one point, Staggs said to Napier "let's go play that video back, I want to see it." Id. at 2:09 a.m. As he tried to play the video, Staggs said "one day I'll learn." Id. at 2:14 a.m. Eventually, Staggs, Whitaker, Napier, and Bell were all in the booking area, and Staggs stated that he did not want to get anyone in trouble, to which Whitaker responded that "doesn't trouble me, no blood, no charges." Id. at 2:20 a.m. Whitaker then said that "if [Hanson's] face get a little red mark, I get that from wrestling with Brian" and "did you see how purple his face got?" Id. at 2:21 a.m. Staggs said "ya, ya I was scared, I really thought you were going to kill him," and an unidentified voice asked "did you see his mouth bleeding?" and said "for a second, I thought he was gonna die." *Id.* When Staggs then said "let's see if I'm fired," Whitaker responded with "we'll see if I'm fired." *Id.*

While watching the video, Whitaker told Staggs that Hanson "took a combative stance, I think you're good." Id. at 2:22 a.m. Staggs continued to watch the video and commented by stating "see, right here is where I go wrong." *Id.* Whitaker said, "no, he took a combative stance, he squared up **[\*\*23]** on you, he's fired up." *Id.* Whitaker then told Bell to watch the video and that Hanson "did take a combative stance towards Brian" Id. at 2:23 a.m. At one point, as Staggs, Whitaker, Napier, and Bell watched the video, all of the Deputies laughed. *Id.* Once the video finished, Whitaker told Staggs "yep, you're probably fired, good working with you, Brian." Id. at 2:24 a.m. And minutes later, because Hanson was yelling, Whitaker told Staggs "why don't you tell him, we're all fired anyway, we don't care to whip his ass tonight." Id. at 2:26 a.m.

During his deposition, Adkins described his own observations, and he stated the following:

> Q Was Mr. Hanson cooperative during the booking process?
>
> A I would say no.
>
> Q What would make you say that?
>
> A . . . And then once they started asking their questions he was not really cooperative with them either about answering questions and stuff.
>
> . . . .
>
> Q And you indicated in your testimony that once Mr. Hanson got to the jail he acted aggressively.
>
> A Uncooperative I think was the word I used.
>
> Q Did you see him, once he got to the jail, ever act aggressively towards you or the jail personnel?

© 2019 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

A From my personal that night or from watching the video?

Q Well, let's start with that night.

A That night, no, I didn't see it. But of course, like, you know, I was back turned towards him, typing on top of the copy machine.

Q From watching the video did you see him act aggressive?

A He took kind of an aggressive stance. Now he didn't swing or anything like [*546] that at them, but he did kind of clench his fists and kind of stand - -

Q What did he do other than turn around and look at the jailer?

A I think just the posture was more than anything, the stance.

Q Just the posture, nothing else?

A Well, I didn't see him - - on the video I didn't see him take a swing or anything but, you know, just turn around and just take kind of like an aggressive stance. But I'd have to see it again to see if he's - - there's a lot of things you could do. Like if I turned around to you and clenched my fist, I mean, that's more than me just turning around and looking at you.

Q Did you see him do that in the video?

A I wasn't really paying attention to his fists in the video. I mean, if I watched it again I could tell you if I saw it or not.

R. 127-3 (MSJ Ex. 3, Adkins Dep. at 24, 50-51) (Page ID #1014, 1019-20). Based on this evidence, a jury could reach the majority's conclusion that Staggs used *de minimis* force. By smacking his hands and belongings on the counter, Hanson indicated his combative mood. When the Deputies told Hanson to calm down, Hanson's agitation escalated. Because Hanson was actively resisting the Deputies' commands to calm down, the Deputies needed to keep order in the detention center to protect themselves and other detainees. Then, when Staggs told Hanson to drop the attitude, Hanson said "I ain't dropping no fucking attitude" while making a sharp turn to face Staggs, suggesting that Hanson was ready to fight. When responding to Hanson, Staggs merely "shoved" Hanson for a split second, which was a justifiable maneuver.1 By interpreting these facts in this manner, a jury might conclude that Staggs acted reasonably.

However, the majority's classification of Staggs's use of force as *de* [**24] *minimis* ignores another interpretation of the evidence, which goes against our duty to "view the facts and any inferences reasonably drawn from them in the light most favorable to the nonmoving party." *Griffith v. Coburn*, 473 F.3d 650 , 655 (6th Cir. 2007) (quoting *St. John v. Hickey*, 411 F.3d 762 , 768 (6th Cir. 2005)). First, Adkins arrested Hanson for disorderly conduct, which is not a particularly severe offense. Additionally, even the majority notes that, "[i]n one sense, Hanson did not seem to pose any direct physical threat to the officers." Maj. Op. at 15. Most importantly though, Staggs did not merely take "his hand and place[] it on Hanson's upper-chest and neck area." Id. at 4. Instead, Staggs quickly curled his right hand's fingers around Hanson's throat as he shoved Hanson into a brick wall. To the extent that Staggs felt that any force was necessary to restrain Hanson, choking Hanson was excessive; especially because three jailers and two officers were within a few feet. Staggs, Whitaker, and Napier also did not attempt to deescalate the tension, which is apparent from their use of profanity. Then, when the Deputies reviewed the video footage, they brain stormed reasons to justify Staggs's use of force. These statements suggest that Staggs grabbed Hanson out of anger, not out of necessity. [*547] By interpreting the evidence in this manner, grabbing Hanson by the throat was not objectively reasonable—but weighing competing evidence is a jury's duty, not ours. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 , 255 , 106 S. Ct. 2505 , 91 L. Ed. 2d 202 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

Although the majority analogizes to *Leary v. Livingston County*, 528 F.3d 438 , 443 (6th Cir. 2008), to bolster its point that Staggs used *de minimis* force, *Leary* suggests that this is a jury question. In *Leary*, the detainee "himself testified at his deposition that the hit 'didn't hurt or nothing,' that he 'didn't have any injury' and that he never sought any medical treatment." 528 F.3d at 443 . Furthermore, the detainee "did not suffer any objectively verifiable injury from the blow," and "[t]here was no hospital visit after the encounter, no doctor's visit, no bruise." *Id* . Because there was no contrary evidence to suggest that the force was not *de minimis*, there was no genuine dispute of material fact. Id. at 443-44 . In fact, we noted that *Leary* "is an unusual case" because "[i]t is not often that a constitutional tort claimant seeks relief for an alleged assault or battery but then says that the defendant's actions 'didn't hurt or nothing' and never says that he felt threatened by the officer's action." Id. at 444 . We summarized that "[w]hatever else non-actionable *de minimis* force may be, it must include a touching that neither 'hurt' nor threatened the individual." Id. at 445 . The holding in *Leary* therefore supports the conclusion that a jury needs to determine whether Staggs's force was *de minimis*.

### b. Clearly Established

Furthermore, the majority glosses over the types of "active resistance" that legitimize the use of force. *See* Maj. Op. [**25] at 16. As we have noted before, "[t]here is no clearly established right for a suspect who 'actively resists.'" *Goodwin v. City of Painesville*, 781 F.3d 314 , 325 (6th Cir. 2015). However, "noncompliance alone does not indicate active resistance; there must be something more." Id. at 326 (quoting *Eldridge v. City of Warren*, 533 F. App'x 529 , 535 (6th Cir. 2013)). While verbal resistance can be active resistance, that type of active resistance occurs "in situations such as where it was '*the final straw* in a series of consciously-resistive acts'"—for instance, the statement "that the suspect would 'fight the officers so that they would have a reason to kill him'" is active resistance. *Id* . (quoting *Eldridge*, 533 F. App'x at 534-35 ). Therefore, simply mouthing off does not fit within the type of verbal hostility that qualifies as active resistance.

Additionally, the majority analogizes to an inapplicable scenario. *See* Maj. Op. at 17 (citing *Lee v. City of Norwalk*, 529 F. App'x 778 , 782-83 (6th Cir. 2013)). In *Lee*, an officer "shoved [the detainee's] shoulder mildly and gestured for her to sit back down in the chair," and another officer "took hold of the sleeves of [the detainee's] sweatshirt in an effort to guide her back to the chair she had been sitting in, then applied force to her neck with his forearm after she flailed and appeared to start to swing at him." 529 F. App'x at 783 . Hanson, in contrast, did not physically resist the Deputies before Staggs grasped Hanson's throat.

In fact, we have examined more analogous situations. For instance, we have held that an officer could not choke or slam a detainee who was argumentative, stated a threatening comment, was not handcuffed, [*548] and flung a jacket at an officer. *See Laury v. Rodriguez*, 659 F. App'x 837 , 843-44 (6th Cir. 2016). We have similarly determined that whether an officer acted reasonably by shoving a detainee into a wall was a jury question, even though the detainee verbally threatened and spat on officers. *Bonner-Turner v. City of Ecorse*, 627 F. App'x 400 , 412 (6th Cir. 2015). Thus, the district court improperly granted summary judgment to Staggs.2

### 2. Napier

The majority also overstates the extent of protection to which Napier is entitled. According to the majority, "none of the officers—save Deputy Whitaker . . .—used any measurable force, let alone unconstitutionally excessive force" after Staggs shoved Hanson against the wall. Maj. Op. at 18. The majority also resolves that "the officers' subsequent actions to restrain Hanson—apart from the extended chokehold—were unquestionably justified under the Constitution." *Id.* Nevertheless, the video shows that, after Hanson pushed Staggs off of him, Napier rushed to help Staggs. R. 128 (MSJ Ex. 15, Hanson.avi at 1:24 a.m.). At one point, Napier grabbed Hanson, but the video does not clearly depict the three-second encounter. *Id.* Although a jury probably would not conclude that Napier's actions were objectively unreasonable because Napier held an unrestrained, combative Hanson for roughly three seconds, Napier did exert some force. Thus, I agree with the majority's conclusion, but I disagree with its reasoning.

Bloomberg Law®

## B. Failure to Train

I also disagree with the majority's reasoning regarding Hanson's *Monell* claim. First, the majority glosses over the applicable [**26] legal elements. Second, although Hanson did not devote pages to this argument, he did cite the relevant law and facts—word count should not be the measuring stick to overcome summary judgment. *See* Appellant's Br. at 48-49. Additionally, Hanson's evidence actually does support his failure-to-train claim, especially when we view all of the evidence in tandem, and the majority overlooks other portions of the record that assist Hanson's argument. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, *but it may consider other materials in the record.*" (emphasis added)); *see also LidoChem, Inc. v. Stoller Enters., Inc.*, 500 F. App'x 373, 383 (6th Cir. 2012). Due to these reasons, I disagree with the majority and conclude that a jury should hear this claim.3

[*549] Regarding the applicable standard, "[t]he inadequacy of police training only serves as a basis for § 1983 liability 'where the failure to train amounts to *deliberate indifference* to the rights of persons with whom the police come into contact.'" *Slusher v. Carson*, 540 F.3d 449, 457 (6th Cir. 2008) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011). "[P]laintiff must show '(1) that a training program is inadequate to the tasks that the officers must perform; (2) that the inadequacy is the result of the [county's] deliberate indifference; and (3) that the inadequacy is closely related to or actually caused the plaintiff's injury.'" *Brown v. Chapman*, 814 F.3d 447, 463 (6th Cir. 2016) (quoting *Plinton v. Cty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008)). There are two ways to prove the second prong: (1) "failure to provide adequate training in light of foreseeable consequences that could result from the lack of instruction" or (2) "fail[ure] to act in response to repeated complaints of constitutional violations by its officers." *Id.* (quoting *Cherrington v. Skeeter*, 344 F.3d 631, 646 (6th Cir. 2003)). Evidence in the record relates to these prongs.

For instance, Bell, a shift commander who could discipline deputies for using excessive force, R. 127-11 (MSJ Ex. 10, Bell Dep. at 45) (Page ID #1090), stated that it was common for deputies to grab detainees by the throat and shove them against the wall—a technique that they learned on the job, not in a training class:

Q Okay. That particular maneuver, grabbing somebody by the throat and shoving them against the wall, is this anything at all of your training as a detention center employee, a hold that is taught or condoned?

A Yes.

Q Okay. And when I have you - -

A That's a restraining move.

Q Okay. When were you taught this?

A Through my training as on - - on training, there at the jail.

Q Okay.

A Not through classes, but on the job training over the years.

Q Okay. That's not something you were taught in any use of force class?

A No.

Q *That's something that was an accepted practice at Madison County Detention Center?*

A *Yes, it was.*

R. 138-5 (Resp. Ex. 5, Bell Dep. at 32) (Page ID #1855) (emphasis added). When Officer Adkins and Officer Gray observed Whitaker grasp Hanson by the throat, they were alarmed; and Adkins might have stated in the video "I don't know, maybe they need better training, I've never [**27] worked with them, I don't do it." R. 128 (MSJ Ex. 14, Hanson audio.avr at 2:06-07 a.m.). Based on this evidence, a jury could conclude that the detention center sanctioned this problematic policy.

Additionally, the detention center might not have required deputies to receive adequate training under Kentucky state law. In Kentucky, "[j]ail personnel shall receive a minimum of sixteen (16) hours annual in-service training." 501 Ky. Admin. Regs. 3:160(4) [*550] (2011) (amended in 2016 to require twenty-four hours). However, Rawlins stated the following regarding his training:

Q When you got on at Madison County Detention Center in January of 2013, did you go through any training before you started your employment, or did you start your employment and then have some training?

A We done [sic] three days of observing other deputies, and then I was paired up with a deputy for the next week-and-a-half, two weeks for - - to observe them and learn from them.

Q Okay. And in the course of that time, is it instruction based, or are you just kind of going along with them?

A We go along with them, and they explain what they're doing and how they do it and why they're doing it.

Q Okay. So it's like shadowing?

A Yes.

Q Essentially. And then when did you get any actual, formal training?

A I'm not sure what the dates on it was. We do inservice training, jailer training, 16 hours every year. I did not have it for 2013, but I did get it in 2014.

Q And is that inservice training, when you received that in 2014, is that the first time that you had any sort of training on use of force or weapons training, things like that?

. . . .

A Yes.

R. 138-4 (Resp. Ex. 4, Rawlins Dep. at 10-11) (Page ID #1844-45). Based on his testimony, Rawlins did not meet the statutory requirement because he did not attend training in 2013. Napier's statements during his deposition also suggest that he did not receive adequate training:

Q And let's assume for the purposes of this conversation that you're exactly right, that you were hired in December of 2013, okay? This training that you received, was it before you started your position at Madison County Detention center, or did you start and you were trained while you were starting?

A I - - I started and then I was trained a couple months later.

Q Okay. So for a couple of months, you start and then you're kind of waiting to receive your training to be,

you know, taser trained and other training at the jail, right?

A Yes, sir.

Q Do you recall how you were brought in - - as far as, once you got the job, was it you got the job and then you start the next day kind of thing, or - -

. . . .

A - - I went for an interview, and then I started the next week prior [sic].

Q Okay. All right. So you remember being taser trained, do you remember when that was?

A No, sir.

Q Did you go anywhere for that, or did that happen at the jail?

A It happened at the detention center.

. . . .

Q Okay. Did you - - how long was this period of training for the taser training? Was it a couple hours or one day or several days? How long?

A It was - - I think it was 8 hours. I think.

Q You think it was a one-day thing?

A Yeah.

R. 150-1 (Reply Ex. 1, Napier Dep. at 16-17) (Page ID #2034-35). However, Napier also acknowledged that he was not employed at the detention center long enough to complete the sixteen hours [**28] of in-service training. R. 138-6 (Resp. Ex. 6, Napier [*551] Dep. at 83) (Page ID #1871). Similarly, Staggs and Whitaker affirmed that they met the statutory requirement. R. 127-7 (MSJ Ex., Whitaker Dep. 12) (Page ID #1050); R. 138-13 (Resp. Ex. 13, Staggs Aff. at 2-3) (Page ID #1920-21). Therefore, a jury needs to weigh this testimony to determine whether the detention center had an inadequate training program.

Because of this evidence, there is a genuine dispute of material fact. The majority is correct that, when viewed alone, one piece of this evidence might not be enough to overcome summary judgment, especially when one officer's misconduct does not create municipal liability. *See* Maj. Op. at 35-37. Nevertheless, all of this evidence works together to create a genuine dispute of material fact regarding whether the training program was inadequate, whether the choking and tasing of detainees was a foreseeable consequence, and whether the inadequate training is closely related to Hanson's injuries. Therefore, the district court improperly granted summary judgment regarding Hanson's *Monell* claim.

Because I disagree with the majority regarding Staggs's use of hands-on force and Hanson's failure-to-train claim, and for all the reasons expressed above, I respectfully dissent from the majority opinion. I agree with the majority that reversal and remand of the district court is warranted on Hanson's claims of excessive force for Whitaker's use of hands-on force; for Staggs's, Whitaker's, Napier's, and Rawlins's use of pepper spray; and for Whitaker's, Napier's, and Rawlins's use of a taser.

fn 1

Hanson testified that the deputies at one point attempted to wake him up with "smelling salts," but the ammonia stick is likely what Hanson smelled.

fn 2

The deputies and the district court focused on this timeframe as the only one where Hanson could have been pepper sprayed.

fn 3

The Fourteenth Amendment likewise "protects a pretrial detainee from the use of excessive force that amounts to punishment." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473, 192 L. Ed. 2d 416 (2015) (quoting *Graham v. Connor*, 490 U.S. 386, 395 n.10, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)).

fn 4

In *Kingsley*, Justice Alito noted in dissent that "whether a pretrial detainee can bring a Fourth Amendment claim based on the use of excessive force by a detention facility employee" remains an open question. *Kingsley*, 135 S. Ct. at 2472 (Alito, J., dissenting) (citing *Graham*, 490 U.S. at 395 n.10). But it is not an open question in the Sixth Circuit. *See Aldini v. Johnson*, 609 F.3d 858, 865 (6th Cir. 2010).

fn 5

Because Hanson was undergoing the booking process and then remained in pre-trial custody, the Fourth, not Eighth, Amendment provides the appropriate lens. *See, e.g., Phelps v. Coy*, 286 F.3d 295, 299-300 (6th Cir. 2002). This distinction matters because "[i]n contrast to the reasonableness standard of the Fourth Amendment, the Eighth Amendment standard focuses on the official's 'obduracy and wantonness.'" Id. at 299 (quoting *Whitley v. Albers*, 475 U.S. 312, 319, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986)); *see also Kingsley*, 135 S. Ct. at 2475 (noting the differing standards between the Fourth and Fourteenth Amendments' objective standard and the Eighth Amendment 's subjective standard).

fn 6

"While there is room for debate over whether the [Fourth or Fourteenth Amendments ] grant[] pretrial detainees more protections than the Eighth Amendment does, we need not resolve that debate here. Under either constitutional guarantee, an excessive-force claimant must show something more than *de minimis* force." *Leary v. Livingston Cty.*, 528 F.3d 438, 443 (6th Cir. 2008) (internal citation omitted)

fn 7

We disagree with Hanson's assertion that this shove was somehow in retaliation for Hanson's comment concerning Kentucky not being an "educated state." The shove comes well after that comment, and the video shows that the deputies hardly reacted to that comment when contrasted with other comments.

fn 8

It's true that in the Eighth Amendment context, the Supreme Court has affirmed the "core judicial inquiry" is not "the extent of the injury," but rather "the nature of the force—specifically, whether it was nontrivial and was applied . . . maliciously and sadistically to cause harm." *Wilkins*, 559 U.S. at 39-40 (internal citation and quotation marks



omitted) (alteration in *Wilkins*). Nonetheless, "[t]his is not to say that the 'absence of serious injury' is irrelevant to the Eighth Amendment inquiry." Id. at 37 (quoting *Hudson*, 503 U.S. at 7 ). Indeed, "the extent of the plaintiff's injury" clearly is one factor courts may consider when determining whether the use of force was *objectively* reasonable under the Fourth or Fourteenth Amendments . *Kingsley*, 135 S. Ct. at 2473 .

fn 9

The dissent's citation to two "more analogous" cases misses the mark because both post-date the events in this case. *See* Dis. Op. at 46.

fn 10

To be fair, in *Coley*, the officer placed the suspect "in a chokehold to the point of unconsciousness," and then "left him to die in his cell." 799 F.3d at 534 , 541 . Likewise, in *Griffith*, the suspect ended up dying. *See Griffith*, 473 F.3d at 652 . But the law certainly placed Deputy Whitaker on notice that this *type of force* is unjustified against "an unresisting . . . detainee." *Coley*, 799 F.3d at 540-41 .

fn 11

While Hanson now asserts that Lieutenant Bell should also face this claim, no evidence—video or otherwise—suggests that she had personal contact with Hanson after the initial struggle.

fn 12

We emphasize that Hanson's counsel at the pleading and summary-judgment stages produced woefully inadequate work and arguably failed to preserve several claims and arguments on appeal. Hanson's appellate counsel demonstrated considerable improvements, but for a few claims and arguments, those improvements come too late or do not suffice.

fn 13

We recognize that "[w]aiver is different from forfeiture." *United States v. Olano*, 507 U.S. 725 , 733 , 113 S. Ct. 1770 , 123 L. Ed. 2d 508 (1993). "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" *Id.* (quoting *Johnson v. Zerbst*, 304 U.S. 458 , 464 , 58 S. Ct. 1019 , 82 L. Ed. 1461 (1938)). However, we use "waiver" in this context as prior courts have done.

fn 14

In addition, the *deputies' accounts* conflict. For example, in Deputy Whitaker's incident report, he stated that he and Deputy Napier pepper sprayed Hanson. And, yet, Deputy Napier testified that he did not know who sprayed Hanson or why it was done. This record is also amplified by certain comments picked up by one of the videos, such as Deputy Whitaker's frank assessment: "We're all fired anyway, we don't care to whip his ass tonight." While the deputies' subjective intent, of course, is irrelevant as to whether the force is unconstitutional, this comment certainly tends to support the notion that Hanson suffered gratuitous and excessive force.

fn 15

The district court cited Hanson's earlier estimates to law enforcement of three or five times. These estimates apparently were given to law enforcement during investigations into Hanson's treatment in the days after his arrest. However, it appears that Hanson consistently reported being tased more than five times. Moreover, the deputies offer no reason to discredit Hanson's sworn testimony that he was tased ten times. The deputies can use any prior


© 2019 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service
// PAGE 24

inconsistent statements against Hanson at trial.

fn 16

Moreover, it's not even clear to us that any inconsistency in the number of taser drives is material to the question of whether the force used was excessive. Even if the jury credited Hanson's prior statement that he was "tased more than five times," his claim may prevail depending on his level of resistance.

fn 17

And some alleged contradictions are not even that material to Hanson's claim. For example, the deputies claim that Hanson's testimony regarding the timing of the taser incident during one window of opportunity—Hanson says "fifteen seconds" after he was pepper sprayed while the video suggests seven minutes—is somehow necessary to Hanson's excessive force claim. But this is precisely the type of immaterial inconsistency that cannot serve to "discredit his entire version of the events." *Coble*, 634 F.3d at 870 .

fn 18

We do not lightly come to the conclusion that each of these deputies must face trial. However, the video in its entirety does not blatantly contradict the possibility that any one or more of these deputies effectuated excessive force through the use of pepper spray or a taser. It will be for the jury to sort through which deputy, if any, has liability for these claims.

fn 19

One crucial distinction between invoking waiver here and not doing so for the pepper spray segment is that the district court made a finding of waiver *and* did not analyze this claim under a supervisory liability theory. *See Hicks*, 928 F.2d at 970-71 (quoting *Richerson v. Jones*, 572 F.2d 89 , 97 (3d Cir. 1978)) ("[T]he policy of declining to consider an argument not raised below is strongest where the district judge was not aware of the argument."). The court, by contrast, analyzed Hanson's claim regarding the use of pepper spray and cited to the very testimony that created a genuine dispute of material fact. *Cf.* Fed. R. Civ. P. 56(c) ("The court need consider only the cited materials . . . .").

fn 20

To take just one example that demonstrates the deficiency of Hanson's counsel below, counsel advanced the following argument below, which is quoted here in its entirety: "MCDC is the employer and supervisor of Officer Staggs and Whitaker and as such, are liable for all of their actions via *respondeat superior*. Plaintiff is entitled to summary judgment against MCDC just as he is against Officers Staggs and Whitaker." Counsel surely should have read *Monell* before trying to sustain a *Monell* claim: "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691 .

fn 21

The dissent finds other pieces of evidence that it then cobbles together to conclude that there is a genuine dispute of material fact. *See* Dis. Op. at 10-14. In doing so, it relies upon Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."). Even if the rule applies to district courts *and* appellate courts—a proposition far from certain, *see LidoChem, Inc. v. Stoller Enters.*, 500 F. App'x 373 , 388-91 (6th Cir. 2012) (Thapar, J., dissenting) (collecting cases)—the rule is quite clearly discretionary, and we decline to reverse the district court on this basis. *See Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985 , 995 (6th Cir. 2007) (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 , 1479-80 (6th Cir. 1989)) ("A district court is



not required to 'search the entire record to establish that it is bereft of a genuine issue of material fact.'").

fn 1

The majority also contends that Hanson has not alleged Staggs's use of force caused an injury. *See* Maj. Op. at 16-17. However, in his briefing, Hanson discusses his injuries on several occasions. *See* Appellant's Br. at 7, 8, 29 (citing evidentiary materials). Furthermore, a medical report states that Hanson had a cervical strain, so there is at least a genuine dispute regarding whether Hanson sustained injuries from Staggs's use of force. *See* R. 127-22 (Mot. Ex. 22, Autry Dep. at 34-35) (Page ID #1312-13).

fn 2

The majority asserts that these cases are inapplicable because they post-date the events in this action. *See* Maj. Op. at 17 n.9. Neither of these cases, however, formulates a new right; instead, each case relies on authority decided before 2013. *See Laury*, 659 F. App'x at 843-44 ; *Bonner-Turner*, 627 F. App'x at 412 . Furthermore, if the majority's reasoning is correct that we cannot rely on cases published after the events have occurred, then the majority also cannot rely on *Lee*, 529 F. App'x at 778 , which was published on July 12, 2013—over four months after Hanson's time at the detention center, R. 25 (Second Am. Compl. ¶ 11) (Page ID #127-28).

fn 3

The majority contends that I have "cobble[d] together" evidence to conclude that there is a genuine dispute of material fact. *See* Maj. Op. at 35 n.21. This evidence, however, is before us and was before the district court, so I have chosen to not engage in willful blindness during de novo review. Furthermore, regarding Rule 56(c)(3) , "our cases are replete with statements that we apply the same Rule 56 standard that was applied by the district court." *LidoChem*, 500 F. App'x at 383 (first citing *Alexander v. CareSource*, 576 F.3d 551 , 557 (6th Cir. 2009); then citing *Tucker v. Tennessee*, 539 F.3d 526 , 531 (6th Cir. 2008); then citing *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603 , 613 (6th Cir. 2003); then citing *E.I. Du Pont de Nemours & Co. v. Okuley*, 344 F.3d 578 , 584 (6th Cir. 2003); then citing *Hunley v. DuPont Auto.*, 341 F.3d 491 , 495 (6th Cir. 2003); then citing *Dotson v. Wilkinson*, 329 F.3d 463 , 466 (6th Cir. 2003); then citing *Thacker v. City of Columbus*, 328 F.3d 244 , 251-52 (6th Cir. 2003); and then citing *Perry v. McGinnis*, 209 F.3d 597 , 600 (6th Cir. 2000)).